*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

TUSCOLA AREA AIRPORT ZONING BOARD OF
APPEALS,

      Appellant,

v

MICHIGAN AERONAUTICS COMMISSION,
DEPARTMENT OF TRANSPORTATION, and
PEGASUS WIND, LLC,

      Appellees.

FOR PUBLICATION
February 24, 2022
9:30 a.m.

No.  357209
Ingham Circuit Court
LC No.  20-000206-AA

---

TUSCOLA AREA AIRPORT AUTHORITY,

      Appellant,

v

MICHIGAN AERONAUTICS COMMISSION,
DEPARTMENT OF TRANSPORTATION, and
PEGASUS WIND, LLC,

      Appellees.

No.  357210
Ingham Circuit Court
LC No.  20-000207-AA

---

Before:  RICK, P.J., and MURRAY and SHAPIRO, JJ.

RICK, P.J.

In these consolidated appeals, appellants Tuscola Area Airport Zoning Board of Appeals (AZBA) and Tuscola Area Airport Authority (Airport Authority) appeal as of right the trial court's order granting appellee Pegasus Wind, LLC's motion to dismiss, with concurrence by appellees the Michigan Aeronautics Commission (MAC) and Michigan Department of Transportation (MDOT), on the ground that neither appellant was an aggrieved party. This case raises an issue of first impression regarding the interpretation of "aggrieved party" under the tall structure act,

-1-

MCL 259.489, and MCR 7.103(A). MCR 7.215(B)(2). For the reasons explained below, we affirm.

## I. BACKGROUND

This controversy has an extensive procedural and factual history involving local regulatory authorities' decisions on a wind energy system being built by Pegasus. Pegasus is constructing a commercial wind energy system in Tuscola County. Some of the planned wind turbines are within the Tuscola Area Airport zoning area. Airport Authority owns the airport and is responsible for maintenance and operation of the landing, navigational, and building facilities. See MCL 259.622. The AZBA is responsible for deciding whether to grant variances from airport zoning regulations. See MCL 259.454.

In April 2019, Pegasus received "Determinations of No Hazard" (DNH) from the Federal Aviation Administration (FAA) for some of its proposed wind turbines within the Tuscola Airport zoning area. The FAA report stated that the turbines "would have no substantial adverse effect on the safe and efficient utilization of the navigable airspace by aircraft or on the operation of air navigation facilities." The report noted that the turbines would require an increase in the minimum descent altitude for flights using a Very High Frequency Omni-Directional Radio Range system, known as VOR. VOR is an older technology for instrument flight. A pilot using a VOR approach must stay above the minimum descent altitude until the aircraft is in position to descend to the runway and the pilot has a visual reference point for the runway.[1] The Determinations also addressed seven letters of objection that the FAA had received in response to its 2018 studies. Although some Tuscola residents petitioned the FAA to review its DNH, the FAA denied the petition for review, reiterating that the proposed turbines would not have an adverse effect on the safe use of the airspace and would not be a hazard to air navigation. While the FAA petition for review was pending, MDOT's Office of Aeronautics held a meeting to review the project and subsequently issued a letter in which it concurred with the FAA's DNH and stated that a "Michigan tall structure permit could be issued" once it received certificates of local variance approval.

Pegasus applied to the Tuscola Airport Zoning Administrator for 40 wind turbine permits within the airport zoning area. The administrator approved seven permits, but denied the other 33 because the turbines would violate certain airport zoning ordinances, such as aircraft descent minimums. Pegasus then sought variances from the AZBA for those 33 turbines.

The AZBA denied all 33 variances, and Pegasus appealed to the Tuscola Circuit Court. In late November 2019, the Tuscola Circuit Court concluded that Pegasus had established the requirements for the variances and reversed the AZBA's denial of the variances.[2] On March 6,

---

[1] Federal Aviation Administration, *Descent to MDA or DH and Beyond*, <http:/faasafety.gov/gslac/ALC/libview_normal.aspx?id=17273> (accessed January 26, 2022).

[2] The AZBA's subsequent applications for leave to both this Court and our Supreme Court were denied. *Pegasus Wind LLC v Tuscola Area Airport Zoning Bd of Appeals*, unpublished order of the Court of Appeals, entered February 26, 2020 (Docket No. 351915), lv den 506 Mich 941 (2020), recon den 507 Mich 871 (2021).

2020, the AZBA issued the 33 variance certificates. The certificates were sent to MAC and, after they were reviewed, MAC issued the tall structure permits (the Permits). Ten days later, the AZBA and Airport Authority each initiated an appeal with the Ingham Circuit Court alleging that it was an aggrieved party of the MAC's order issuing the Permits.

In May 2020, Pegasus filed a motion to expand the record and a motion to dismiss the appeal. Pegasus alleged that the circuit court lacked jurisdiction because MAC's issuance of the Permits was not an order or rule that was appealable under the tall structure act, MCL 259.481 *et seq.*, (the Act). Pegasus further argued that, even if MAC's issuance of the Permits was appealable, neither the AZBA nor Airport Authority were aggrieved parties. MDOT and MAC filed a joint brief concurring in both the motion to dismiss and the motion to expand the record. Electing not to hold oral argument, the circuit court granted Pegasus's motion to dismiss. Although the court concluded that it had jurisdiction over an appeal of the Permits, it determined that neither the AZBA nor Airport Authority were aggrieved parties.

These appeals followed.

## II. STANDARD OF REVIEW

This Court reviews de novo as a question of law whether a party has standing to invoke appellate review of an administrative ruling. *Olsen v Chikaming Twp*, 325 Mich App 170, 180; 924 NW2d 889 (2018). This Court also reviews de novo "whether a matter is properly placed before a court by a person with standing," as well as the interpretation of statutes and court rules. *Matthew R Abel, PC v Grossman Investments Co*, 302 Mich App 232, 237; 838 NW2d 204 (2013).

## III. ANALYSIS

The sole issue before this Court is whether either the AZBA or Airport Authority is an "aggrieved party" under MCL 259.489 and MCR 7.103(A). We hold that the circuit court properly concluded that neither the AZBA nor Airport Authority was an aggrieved party.

The AZBA and Airport Authority filed their appeals in the circuit court pursuant to MCL 259.489, which provides:

> Within 10 days after the issuance of an order or rule of the commission,[3] a person aggrieved by the order or rule may appeal to or have the action of the commission reviewed by the circuit court of Ingham county in the manner provided for the review of orders of other administrative bodies of this state.

Under MCR 7.103, a circuit court has jurisdiction over an appeal as of right "filed by an aggrieved party from . . . a final order or decision of an agency from which an appeal of right to the circuit court is provided by law." MCR 7.103(A)(3); *MCNA Ins Co v Dep't of Technology, Mgt & Budget*, 326 Mich App 740, 744-745; 929 NW2d 817 (2019). Thus, under MCL 259.489, a party seeking relief from a decision from the MAC must establish to the circuit court that they are "an

---

[3] "Commission" refers to the MAC. See MCL 259.481(d).

aggrieved" party. See MCL 259.489. "An aggrieved party is not one who is merely disappointed over a certain result. Rather, to have standing on appeal, a litigant must have suffered a concrete and particularized injury, as would a party plaintiff initially invoking the court's power." *Federated Ins Co v Oakland Co Rd Comm*, 475 Mich 286, 291-292; 715 NW2d 846 (2006) (citation omitted). "To be aggrieved, one must have some interest of a pecuniary nature in the outcome of the case, and not a mere possibility arising from some unknown and future contingency." *Id.* at 291 (quotation marks and citation omitted).

## A. DOCKET NO. 357209 (AZBA)

The AZBA argues that the trial court erred by concluding it was not an "aggrieved person" with standing to appeal MAC's decision to issue a permit to Pegasus. We disagree.

The circuit court concluded that AZBA had not established that it would suffer a concrete and particularized injury or that it had an interest of a pecuniary nature beyond mere possibility. The court rejected the AZBA's argument that its role in enforcing the Airport Ordinance by hearing and deciding requests for variances gave it a "substantial interest in limiting the height of structures and regulating the use of property in the vicinity of the airport." The circuit court noted that the variances in this case had already been issued, the Tuscola Circuit Court had already issued orders with respect to the conditions the variances could contain, and that once those variances were obtained, the Act allowed MAC to issue the Permits. The circuit court concluded that "[t]he AZBA's role in this matter has already been resolved, and the actions of the MDOT and the MAC based on the variances already issued do not present a concrete or particularized injury or an interest of a pecuniary injury."

On appeal, the AZBA contends that using the circuit court's reasoning, no entity would be able to appeal a permit in this matter, even though the Act permits aggrieved parties, not simply applicants, to appeal. However, the fact that the AZBA is not an aggrieved party in this case, or that no one else could be considered an aggrieved party in this case, does not automatically render the circuit court's decision erroneous. The Legislature "may permissibly *limit* the class of persons who may challenge a statutory violation." *Miller v Allstate Ins Co*, 481 Mich 601, 607; 751 NW2d 463 (2008). As MAC points out, the Legislature can make that limitation very strict, as it did in MCL 324.35305(1), which limits those who can contest a permit or decision to the applicant or the "owner of the property immediately adjacent to the proposed use." Thus, in some instances there may not be an entity that constitutes an aggrieved party after an administrative body renders a decision. That this may have occurred here does not evidence that the appeals process provided for in the Act is being circumvented or rendered moot.

Appellees argue that the AZBA lacks any authority to file an administrative appeal, noting the limited nature of its authority delineated in MCL 259.457 and the Tuscola Airport Zoning Ordinance (the Airport Ordinance). We agree.

"Townships have no inherent powers; they possess only those powers expressly granted them by the Legislature or the Michigan Constitution or 'fairly implied' therefrom." *Hughes v Almena Twp*, 284 Mich App 50, 61; 771 NW2d 453 (2009) (citation omitted). A zoning board of appeals "is a municipal administrative body, charged with interpreting the ordinance, hearing appeals, granting variances, and performing various other functions that may arise in the

administration of the zoning ordinance." *Sun Communities v Leroy Twp*, 241 Mich App 665, 670; 617 NW2d 42 (2000) (citation omitted).  Under the Airport Ordinance, "[t]he Board of Appeals has the powers set forth in Section 27 of the Airport Zoning Act, being MCL 259.457[4], and shall exercise such powers as are conferred upon it in the Airport Zoning Act and in this Ordinance." Airport Ordinance § 5.2.  Airport Ordinance Section 5.2(D), titled "Powers," provides:

> The Board of Appeals, by the concurring vote of a majority of its members, shall have the power to issue certificates of variance under the provisions of this Ordinance, or to otherwise decide appeals from any order, requirement, rule, regulation, decision or determination made by the Airport Zoning Administrative Agency/Zoning Administrator *under the powers conferred upon it by this Ordinance*.  [Emphasis added.]

Thus, under the Airport Ordinance, these are the sole powers conferred on the AZBA.

The AZBA attempts to rely on the purpose of the Airport Ordinance to "prevent[] the establishment of airport hazards, restrict[] the height of structures and objects of natural growth or otherwise regulate[] the use of property in the vicinity of the Tuscola Area Airport . . . ."  Airport Ordinance § 1.2.  However, that is the stated purpose of the Airport Ordinance, not the stated purpose of the AZBA.  Two additional purposes stated for the Airport Ordinance are "designating the Airport Zoning Administrative Agency/Zoning Administrator charged with the administration and enforcement of such regulations; [and] establishing an airport zoning board of appeals[.]" Airport Ordinance, § 1.2.  Therefore, according to the Airport Ordinance, administration and enforcement of the regulations does not sit with the AZBA, but with the Zoning Administrative Agency/Zoning Administrator.

Moreover, Airport Ordinance §  6.4, "Civil Action Available," gives the authority to initiate an action in Tuscola Circuit Court to "[t]he Airport Zoning Administrative Agency/Zoning Administrator, on behalf of and in the name of the County of Tuscola" in order to "prevent,

---

[4] MCL 259.457 provides:

> All airport zoning regulations adopted under the provisions of this act shall provide for a board of appeals to have and exercise the following powers:

> (a) To hear and decide appeals from any order, requirement, decision, or determination made by the administrative agency in the enforcement of the zoning regulations, as provided in section 29;

> (b) To hear and decide any special exceptions to the terms of the airport zoning regulations upon which such board may be required to pass under such regulations;

> (c) To hear and decide specific variances under section 24.

restrain, correct or abate any violation of this Ordinance or under the Airport Zoning Act . . . or of any order or ruling made in connection with their administration or enforcement . . . ." Furthermore, the AZBA and the Airport Zoning Administrative Agency/Zoning Administrator are entirely separate entities. Article 2 defines "Airport Zoning Administrative Agency" as "[t]he Tuscola County Airport Zoning Administrator or its Agent, the local zoning administrator," which is distinctly separate from the AZBA, "[a]n independent, five (5) member board appointed by the Tuscola County Commissioners." Airport Ordinance, §§ 2.9, 2.10. Accordingly, the Airport Ordinance does *not* authorize the AZBA to file suit in relation to issues related to the ordinance. Rather, the Airport Ordinance expressly grants and limits that authority to someone other than the AZBA.[5]

The AZBA also relies on *Dept of Consumer & Indus Services v Shah*, 236 Mich App 381; 600 NW2d 406 (1999), arguing that it is an "aggrieved party" because it has a "statutory duty to protect the Airport against hazards and therefore an interest in ensuring that the Tall Structure Act is properly applied." However, *Shah* does not support the AZBA's position.

In *Shah*, the petitioner, the Department of Consumer and Industry Services, appealed the final order of dismissal issued by the Disciplinary Subcommittee of the Board of Medicine. *Id*. at 384. The petitioner had charged the respondent with multiple violations of the Public Health Code. However, after a hearing, the disciplinary subcommittee adopted the hearing referee's recommendation and dismissed the charges against the respondent. On appeal, the respondent argued that the petitioner lacked standing to appeal the subcommittee's decision. *Id*. This Court held that the petitioner, "[a]s an agency charged with enforcing the Public Health Code," had a "cognizable interest in ensuring that a hearing referee properly applies the law in an administrative proceeding." *Id*. at 385-386. Further, this Court concluded that the petitioner had "an interest in the litigation because misconstruction or improper application of the law would hinder [the petitioner's] ability to enforce the law as the Legislature intended." *Id*. at 386. In contrast, the instant case involves issuing a permit under MCL 259.482a, which the MAC, not the AZBA, is tasked with enforcing. Further, our Supreme Court has recognized that "an interest in the proper enforcement of a statute has never before been thought sufficient to confer standing; instead, a concrete and particularized injury is required to confer standing." *Federated Ins Co*, 475 Mich at 291 n 4.

The AZBA contends that the statutory appeal right is "meaningless if the local agencies *charged with regulating structures near airports* do not have standing to appeal the erroneous issuance of a Tall Structure Permit for wind turbines beside an airport." However, as the circuit court noted, the AZBA has the opportunity to regulate the structures *before* any tall structure permit ever gets issued. That is, a tall structure permit is generally not issued unless the AZBA has already authorized the variances necessary. See MCL 259.482a(1). To permit the AZBA to be an aggrieved party to MAC's issuance of tall structure permits, particularly in this case in which the

---

[5] Notably, even the agency/administrator's power to bring suit is limited and permitted only "if the local unit's administrative body or the County Board of Commissioners, respectively, shall have authorized a civil action." Airport Ordinance, § 6.4.

Permits were issued in reliance on the AZBA's certificates of variance approval, would give the AZBA an unwarranted second bite at the apple.

This interpretation is further supported by Airport Ordinance, § 6.1. This provision grants MAC the authority, as an aggrieved party, to appeal a determination by the AZBA.[6] This provision flows logically from the fact that MAC's preliminary determinations can essentially be "overruled" by the AZBA, rendering MAC an aggrieved party. MAC, on the other hand, does not have the authority to "overrule" the AZBA. The MAC generally has already provided notice that a permit can be issued if variance certificates are received. Therefore, there is little for MAC to do but issue a permit after it received variance certificates.

Considered in context, it would be both illogical and inconsistent for us to conclude that the AZBA has the ability, let alone the authority, to appeal MAC's issuance of a tall structure permit. By the time the issues reach MAC, the AZBA has already reviewed all of the evidence, held hearings, and created whatever record it believes is necessary to support its variance decision. The AZBA can hardly be an aggrieved party under such circumstances. Indeed, the only conceivable times the AZBA would want to appeal the issuance of a tall structure permit after it had already issued the requested variance would necessarily be times when it was simply displeased by the result, i.e., when the courts overrule its denial, as occurred in this case, or when the makeup of the AZBA changes between issuance of the certificates and issuance of the permit so that the minority that wanted to deny a variance is now a majority.

Lastly, the AZBA contends that for MDOT to grant a tall structure permit it must satisfy certain requirements "including an opinion by MDOT that the Michigan Tall Structure Permit could be issued". The AZBA argues that "MDOT making such [an] opinion requires an airspace study or finding of noninterference, which is lacking in the present case." However, this argument relates to the substantive merits of the case, not whether the AZBA has standing. Accordingly, we conclude that the circuit court did not err when it determined that the AZBA was not an aggrieved party.

## B. DOCKET NO. 357210 (AIRPORT AUTHORITY)

As with the AZBA, the circuit court concluded that Airport Authority was not an aggrieved party because it had not established that it would suffer a concrete and particularized injury or that it had an interest of a pecuniary nature beyond mere possibility. More specifically, the circuit court determined that Airport Authority failed to provide any evidence about how the wind turbines "will affect its current flight paths, how many airplanes might cease using the airport, or any financial data related to those flights" to support its assertion that it will lose money if fewer airplanes use the airport because of the wind turbines. The circuit court noted that the record was filled with concerns from pilots of things the turbines "may" do. The court likewise acknowledged

---

[6]Airport Ordinance, § 6.1 provides, "Any person, including the Michigan Aeronautics Commission on behalf of and in the name of the State, aggrieved by any decision of the Tuscola Area Airport Zoning Board of Appeals, may appeal to the Circuit Court of the County of Tuscola as provided in [MCL 259.460]."

that the administrative record reflected departure paths "potentially" excluding aircrafts from departing under certain weather conditions. Ultimately, however, the court explained that "these potential risks were specifically not considered by the FAA in its determination because the FAA determined they did not constitute a 'substantial adverse effect' on safety at the airport." Thus, the circuit court concluded that Airport Authority was "not able to state, as a matter of concrete, particularized injury, that there will be actual losses of flights, fuel sales, or use of the airport."

The circuit court also rejected Airport Authority's concerns regarding loss of federal grants from the FAA because it "presented no evidence or authority to suggest that the FAA, having determined that the wind turbines present no substantial safety risk, will subsequently revoke a grant to the airport based on a safety risk presented by the wind turbines." In reaching these decisions, the circuit court noted that the Tuscola Circuit Court had "already rejected several of these arguments," and although it was not bound by those decisions, it found that Airport Authority's "arguments, testimony, and evidence have not changed in any way that would bring this Court to a separate conclusion."

The determination whether Airport Authority is an aggrieved party centers on whether Airport Authority's alleged harms are "concrete and particularized." See *Federated Ins Co*, 475 Mich at 291. Airport Authority argues that "there is a substantial risk that [it] will lose revenue because of the steeper flight paths imposed by the grant of the Tall Structure Permit" to the extent that it "has shown a sufficient likelihood of harm." It further argues that certainty is not required and cites *Detroit Downtown Dev Auth v US Outdoor Advertising, Inc*, 480 Mich 991, 992; 742 NW2d 133 (2007), for the premise that any "potential" cause of economic damage is sufficient.[7]

In that case, an advertising agency had sought a variance from the Detroit Board of Zoning Appeals (ZBA) to allow them to place large advertisements on a variety of buildings. *Detroit Downtown Dev Auth v US Outdoor Advertising, Inc*, unpublished per curiam opinion of the Court of Appeals, issued April 12, 2007 (Docket No. 262311), pp 1-2, rev'd 480 Mich 991 (2007). Because the Detroit Downtown Development Authority (DDA) owned a parking garage located within 300 feet of one of the buildings, it received notice of the advertising agency's request for a variance, and the DDA opposed the advertising plans. *Id*. at 2. The ZBA granted the requests for two buildings, but denied requests for two other buildings. *Id*. The DDA appealed the decision to the circuit court, arguing that the decision was not supported by competent, material, and substantial evidence. *Id*. The advertising agency argued that the DDA lacked standing, but the circuit court disagreed and reached the merits. *Id*. On appeal to this Court, the advertising agency again argued that the DDA lacked standing. *Id*. This Court held that the DDA's opinion "that the super graphics will harm its overall development plan of the downtown area" was "unsupported

---

[7] Although *Detroit Downtown Dev Auth*, 480 was a "standing" case and not an "aggrieved party" case this distinction is of no consequence here because although the former governs the right to bring suit and the latter to the right to appellate review of an administrative decision. But in either case, a particularized and concrete injury must be shown. i.e. the injury arose from the actions of a court judgment or the underlying facts of the case. See *Olsen*, 325 Mich App at 181.

by evidence," and, therefore, insufficient to satisfy the requirement of a "concrete," "injury in fact." *Id.* at 3. Our Supreme Court reversed this Court, holding:

> [P]laintiff has shown that it has made substantial investments in the area surrounding the variance, that it owns nearby buildings, and that it has a supervisory authority over the development district that encompasses the variance. Further, plaintiff has shown that the variance will potentially cause economic injury to its interests. Because a judgment in favor of plaintiff will eliminate these injuries, plaintiff has established standing to challenge the variance. [*Detroit Downtown Dev Auth*, 480 Mich at 991-992 (citation omitted).]

The Airport Authority argues that the Supreme Court's order in *Detroit Downtown Dev Auth* should be read broadly to mean that a showing of "potential" for any economic injury to its interests is sufficient to constitute a concrete, particularized, and actual or imminent injury. We disagree. The instant case is distinguishable because the DDA's interests were greater than mere ownership of property near the buildings that would show the advertisements and the degree of the "potential" injury was far greater than has been suggested here. The DDA had invested over $65 million in the "affected area" was statutorily created to "eliminate causes of property value deterioration," *Detroit Downtown Dev Auth* (METER, J., dissenting), unpub op at 4 (citation omitted) and "held supervisory authority over the development district that encompasse[d] the variance," *Detroit Downtown Dev Auth*, 480 Mich at 992. Therefore, the potential injuries that the DDA was likely to incur were not simply the loss of renters in the garage, but loss of value to its millions in investments to the larger area and negative impacts related to its statutory obligations. This is a far more concrete and particularized injury than those alleged by Airport Authority, as explained more fully below. Moreover, the instant case is further distinguishable from *Detroit Downtown Dev Auth* because, unlike in the instant case, the DDA sought to challenge the grant of a variance by the ZBA—not the issuance of a permit from another agency after variances had already been granted by the ZBA. Nonetheless, we consider the Airport's Authority's arguments in turn.

Airport Authority has alleged three potential harms: loss of revenue to the airport caused by fewer pilots using the airport, injury to its safety interests resulting from alteration of flight paths "to a steeper and riskier approach angle" resulting from the building of the turbines, and revocation of federal grants by the FAA.

Looking first at the loss of revenue to the airport, Airport Authority relies on MDOT reports to establish that "the average visitor to the airport spends $262" and contends that the loss of even one visit would establish a pecuniary interest. There are multiple problems with this argument. First, given that the number of visitors to an airport varies from year to year, even without turbines, the loss of multiple visitors, let alone a single one, is not enough to establish that the loss – if any - was created by the installation of turbines. Rather, weather conditions, the economy, individual pilot's personal finances, and any number of other factors necessarily affect the number of visitors to an airport in any given year. Absent some way to correlate the loss of revenue to the installation of turbines, this assertion of harm is nothing more than speculation. See *Federated*, 475 Mich at 291.

Second, MDOT's method of calculating of the spending of the "average" visitor to the airport is nothing more than dividing revenue by the number of visits to the airport. Airport Authority has provided no evidence to establish that this number can or should be used to represent what the average pilot, who might not make a particular visit because of the turbines, spends. There is no evidence to indicate what types of revenue, such as fuel sales and hangar rental, make up the $262 figure, nor any evidence to establish whether the typical pilot that might be affected by the changes in descent altitude makes any of these types of expenditures when it uses the airport. Further, although it is reasonable to conclude that the weather will cause the cancellation of some flights, this does not automatically translate into a loss of revenue. Just because a pilot does not make a flight on a particular day because of the weather does not establish that the visit is lost forever—it may simply be deferred to a different day when weather conditions are better. Indeed, weather conditions prevent pilots from being able to fly even without the presence of turbines. However, these losses are unpredictable and entirely caused by unexpected weather conditions.

Although Airport Authority argues that inclement weather is all but certain to occur, inclement weather is affected by so many different variables that its occurrence is extremely difficult to predict and cannot constitute anything other than a mere possibility arising from multiple unknown and future contingencies. See *Truman v J I Case Threshing Machine Co*, 169 Mich 153, 158; 135 NW 89 (1912) (holding that anticipated profits from anticipated use of a threshing machine were "too conjectural and uncertain" because threshing "is conducted in the open air and subject to contingencies of weather, breakages, delays, . . . and skill and energy in operating the machine, which make it impracticable definitely to ascertain . . . the profits") (quotation marks and citation omitted). Further, although pilots expressed concerns that the wind turbines could create navigational hazards or pose a threat to the safety of the airspace, not a single pilot stated that the addition of the turbines would definitely cause them to stop using the airport or that they had intended to fly under VFR during periods of low visibility, but would now be prevented from doing so as a result of the turbines.

Airport Authority contends that the circuit court erred by faulting Airport Authority for failing to provide evidence of how the turbines would affect current flight paths, how many airplanes might cease using the airport, or any financial data related to those flights. Airport Authority notes the "higher than standard minimum climb gradient," which " 'potentially excludes aircraft from departing Tuscola Area Airport . . . .' " This evidence only supports the circuit court's determination that Airport Authority failed to prove anything concrete, given that the statement specifically provides that it only *potentially* excludes aircraft. The vague potential of this outcome is enough to render this harm a mere possibility arising from some unknown and future contingency. See *Federated*, 475 Mich at 291.

Airport Authority's next purported harm is "a concrete and particularized injury to its interests in safety because it would be required to alter its flight paths to a sleeper and riskier approach angle." However, the record does not support that there is any injury to Airport Authority's safety interests from the building of the turbines. Not only has the FAA issued its DNH, but it also rejected these exact arguments when raised in the petition requesting a discretionary review of the determinations, concluding that "the structures would not have an adverse effect on the safe and efficient use of the navigable airspace by aircraft and would not be a hazard to air navigation."

Notably, the circuit court relied, in part, on the Tuscola Circuit Court's determination in the reversal opinion that "[n]o evidence was presented by an expert to substantiate the contention that the turbines would negatively affect airport operations, nor did the members of the public cite any reliable authority which would contradict Pegasus' evidence." The FAA already considered the pilot testimony regarding the concerns and arguments being raised by Airport Authority before it issued its affirmation of the DNH's conclusion that the turbines "would not be a hazard to air navigation." No new evidence has been added to the record since that time. There is no support in the record for Airport Authority's contention that there is an injury to its safety interests created by MDOT's issuance of the Permits in reliance on the certificates issued by the AZBA.

MAC argues that even if turbines in general could cause such harms, "it is entirely speculative that *these* turbines will specifically harm Airport Authority." Indeed, when Airport Authority sought to challenge the FAA's DNH, the D.C. Circuit Court of Appeals noted that "[t]he area already contains numerous other turbines." *Tuscola Area Airport Authority v Dickson*, unpublished memorandum opinion of the United States Court of Appeals for the District of Columbia Circuit, issued November 20, 2020 (Docket No. 19-1153); 831 F Appx 511 (DC, 2020). The record does not indicate that Pegasus's turbines are taller, closer, or somehow more obstructive of flight navigation than the hundreds already in existence. In fact, the FAA concluded that "the aggregate impact on air safety would be negligible." *Id.*

Airport Authority argues that the public comments from pilots related only to the new turbines—not those already constructed. Airport Authority also argues that the existing turbines did not change the flight altitude or potential for inclement weather. Neither the issuance of the Permits nor the actual construction of the turbines will alter the potential for inclement weather any more than the existing turbines. Further, as discussed, the FAA repeatedly concluded that Pegasus's turbines do not create a safety risk, either individually or in aggregate with the ones already in existence.

Lastly, Airport Authority contends that it might lose FAA funding because the turbines pose a hazard. The FAA has already determined that the turbines will pose no hazard to air navigation. To argue that the FAA would revoke funding on a conclusion that those same turbines now constitute a hazard is counterintuitive at best. On this record, there is no evidence to conclude that Airport Authority bears any real risk of losing future funding from the FAA as a result of Pegasus building turbines that the FAA has explicitly determined are not a hazard. This purported harm is nothing but a mere possibility arising from some unknown and future contingency. *Federated*, 475 Mich at 291.

Affirmed.

/s/ Michelle M. Rick
/s/ Douglas B. Shapiro

-11-